**John Albert Shine, Plaintiff-Appellee, v. Wabash Railroad Company, Defendant-Appellant.**

**Gen. No. 10,044.**

Third District.
February 14, 1956.
Released for publication March 1, 1956.

John W. Coale, of Taylorville, for defendant-appellant.

Hershey and Bliss, of Taylorville, and Baird, Lippert and Jones, of Decatur, for plaintiff-appellee.

PRESIDING JUSTICE HIBBS delivered the opinion of the court.

The appellant, Wabash Railroad Company, has appealed from the Circuit Court of Christian County, Illi-

nois from a judgment entered against it in favor of John Albert Shine, the appellee here.

Appellee filed his complaint on the 3rd day of August 1953 alleging that on June 3, 1932 Walter S. Franklin and Frank C. Nicodemus, Jr. were receivers operating the Wabash Railway Company; that the defendant Wabash Railroad Company succeeded to and assumed the liabilities of said receivers arising out of the operation of the railroad; that the right of way of the railroad extended through the city of Decatur in an easterly and westerly direction and was intersected by a beaten pathway at a point between two streets, namely, University Avenue and Oakland Avenue "where a large number of persons daily crossed said tracks with the knowledge of the defendant, all within the residential limits of said city"; that the plaintiff was born on August 11, 1930 and on August 11, 1953 would be twenty-three years of age; that one A. E. Watson was at that time on June 3, 1932 operating a locomotive for the receivers pulling a train of cars on said railroad in a westerly direction approaching said Oakland Avenue; that the plaintiff, while passing over said pathway along the tracks of said right of way, the defendant, Watson, and the defendant, Wabash Railroad Company (a) negligently, carelessly and improperly drove and managed said train, (b) negligently and carelessly failed to give warning of the approach of the train, (c) negligently and carelessly failed to maintain a proper and vigilant lookout, (d) operated said train at a high and dangerous rate of speed, (e) permitted the road bed and right of way to become covered and obscured from view by tall weeds, grass and bushes, and (f) failed to stop or slow the locomotive after having knowledge that the plaintiff was in danger, as a result of which carelessness and negligence the plaintiff was permanently crippled. Later in the proceedings the complaint was amended

523

alleging that the injury was willfully and wantonly inflicted.

The defendant filed a motion to dismiss the action alleging that the suit arose out of an accident on June 3, 1932; that The Livestock National Bank of Chicago was appointed by the Probate Court of Cook County as guardian of the plaintiff and qualified as such; that afterwards the guardian petitioned the court to accept $1,000 to settle the cause of action and such court authorized such settlement, that the guardian upon receipt of the said sum of $1,000 executed a release by virtue of which the present action was barred by the prior judgment and that the claim of the plaintiff had been released and discharged. Attached to the verified motion was a copy of the release executed by The Livestock National Bank of Chicago as such guardian to the receivers of the Wabash Railway Company.

The plaintiff filed a counter-affidavit alleging that The Livestock National Bank of Chicago was not the regularly appointed and qualified guardian; that the plaintiff was at the time of the injury a resident of Macon County, Illinois and not a resident of Cook County, that the Probate Court of that county had no jurisdiction to appoint a guardian for the plaintiff and that such jurisdictional defects appeared on the petition for appointment. Attached thereto was a transcript of the record of the Superior Court of Cook County in the case entitled The Livestock National Bank of Chicago, Guardian of the Estate of John Albert Shine, a Minor, Plaintiff v. Walter S. Franklin and Frank C. Nicodemus, Jr. Receivers of the Wabash Railway Company, and also a transcript of the proceedings in the Probate Court of Cook County in the matter of the Estate of John Albert Shine.

The transcript from the Probate Court of Cook County with reference to this estate shows (first) that the petition for the appointment of a guardian for

John Albert Shine was filed by his mother, Myrtle May Shine, and it recited that the minor was then living with Myrtle May Shine, who resided at 1344 Johns Avenue, Decatur, Illinois, and there were no assets in said estate except a right of action for personal injuries against the Receivers of the Wabash Railway Company, and The Stock Yards Trust and Savings Bank was appointed as such guardian and qualified as such, and (second) thereafter The Livestock National Bank of Chicago, successor to The Stock Yards Trust and Savings Bank as such guardian filed a petition to compromise the cause of action and recited "that your petitioner is now informed and is advised by its said attorney, William Wallace McCallum, that the said minor at the time of the injury and does now reside with his parents in their home at Decatur, Illinois." The order of the Probate Court of Cook County authorizing said settlement finds: "that the injury to said minor was occasioned on the 3rd day of June, A. D. 1932 by reason of the said minor who was then twenty-two months of age, unattended, crawled out of his yard which adjoins the Wabash Railway Company right of way at Decatur, Illinois, climbed onto the right of way and tracks and was struck by one of the trains belonging to said Wabash Railway Company."

The motion to dismiss was denied and thereafter the defendant answered. Upon the trial at the close of plaintiff's case the charges of negligence (b) and (d) aforesaid, namely, negligently, carelessly and improperly drove and managed said train and operated said train at a high and dangerous rate of speed, were withdrawn by the plaintiff. At the close of all the evidence the defendant made a motion for directed verdict and tendered instructions to that effect which were respectively denied and refused. Thereupon the defendant, A. E. Watson, was dismissed by the plaintiff as a party defendant. The jury returned two verdicts: (1)

finding the defendant guilty of negligence and assessing plaintiff's damages at $50,000, and (2) finding the defendant not guilty as to willfulness and wantonness. Judgment was entered upon the verdicts and thereupon the defendant filed a motion for judgment notwithstanding the verdict under the negligence count and for a new trial.

■ We are first confronted with appellee's contention that the compromise authorized by the Probate Court of Cook County which had issued the letters of guardianship and the release given was a bar to the action. Section 2 of the Guardian and Ward Act, being par. 2, Chap. 64, Cahill's Ill. Rev. Stat. 1931 provides: "The County Courts in their respective counties may, when it shall appear necessary or convenient, appoint guardians of minors, inhabitants of or residents in the same county, and to such as reside out of this State and have an estate within the same, in the county where the real estate or some part thereof may lie; or if he has no real estate, then in any county where he may have personal property; . . ." The principal case relied upon by the appellant is Balsewicz v. Chicago, B. & Q. R. Co., 240 Ill. 238, where a minor was killed in a railway accident in Kewanee, Henry County, Illinois. His parents lived in Bureau County, where the minor had his home. A stranger who had no right to administer on the estate obtained letters of administration in Cook County and subsequently settled the cause of action for the death with the railway company. Later the deceased's father took out letters of administration in the county of his residence and sued the railroad for the death. The court say at page 246: "The probate court of Cook county has general jurisdiction of the settlement of the estates of deceased persons, and, when adjudicating upon questions arising in such matters, as liberal intendments are to be made in favor of its findings as of those of courts of general jurisdiction. (Bostwick v.

Skinner, 80 Ill. 147; Blair v. Sennott, 134 Ill. 78.) Residence of the deceased, at the time of his death, within the territorial jurisdiction of the court is essential to give the probate court jurisdiction to grant administration of his estate. But the probate court having general jurisdiction of the subject matter of the settlement of estates, if such court has assumed jurisdiction of a particular estate and granted administration thereof, then, in accordance with the rule in regard to the acts of courts of general jurisdiction that all intendments of law are in favor of such acts and that they are presumed to have jurisdiction to give the judgments they render *until the contrary appears,* such grant of administration is conclusive and not subject to attack in a collateral proceedings." (Italics ours.) It will be noted in the Balsewicz case, supra, it is said in substance that the Probate Court having general jurisdiction of the subject matter of the settlement of estates, if such court has assumed jurisdiction of a particular estate and grants administration, then all intendments are in favor of the jurisdiction of such court *until the contrary appears* (italics ours), and such grant of administration is not subject to attack in a collateral proceeding.

Here it is admitted that the jurisdictional defect appears on the transcript of the record of the proceedings in the matter of the guardianship of this plaintiff in the Probate Court of Cook County. In Sharp v. Sharp, 333 Ill. 267, a minor after his majority in an original action had a deed declared void which had deprived him of a remainder interest in real estate during his minority, and the court said there at page 273: "In case of collateral attack a presumption in favor of the regularity and validity of the decree is indulged from a statement in the decree that the court had jurisdiction of the subject matter and of the parties. Nothing will be presumed, however, in favor of jurisdiction in the face of facts appearing in the man-

datory record showing that it did not exist. (People v. Brewer, 15 R. C. L. 895; Old Wayne Life Ass'n v. McDonough, 204 U. S. 8.) A presumption is not evidence and cannot be treated as evidence. It cannot be weighed in the scale against evidence. (People v. Cochran, 313 Ill. 508.) Presumptions are never indulged in against established facts."

In the case of In re Cash, 383 Ill. 409 it is said at page 429: "Where the record itself shows the evidence upon which the court acted in finding that it had jurisdiction, no presumption of jurisdiction can be indulged, and where the record shows the evidence upon which the court acted is insufficient, the finding in favor of jurisdiction is not conclusive. The presumption of jurisdiction applies only when the record is silent upon the question. (citations.)"

■ In the face of the transcript of record of the Probate Court of Cook County, we are not permitted to indulge in any presumption that such court ever had any jurisdiction in the matter. Such record shows affirmatively that the court did not have jurisdiction. The trial court did not err in overruling the motion to dismiss.

The appellant contends that the trial court erred in not entering judgment notwithstanding the verdict and overruling the motion for new trial. This requires a summary of the testimony in the case.

The admitted facts in the case show that the main line of the Wabash Railroad runs in an easterly and westerly direction through the city of Decatur, and this accident occurred in a residential and business area of that city where the tracks for a mile each way from the point of the accident are straight. The right of way intersects North Oakland Avenue, a north and south street, at right angles, and it is 540 feet from the west edge of North Oakland Avenue to the next north

528

and south street to the west known as University Avenue, which is not open across the tracks. North of the right of way between the two streets is a long block, 560 feet in length, the south half of which was owned by the Hunter-Pogue Lumber Company, on the south portion of which was situated two fairly large buildings and three other buildings north thereof, one of which was at the west end of the block next to University Avenue. North of the lumber yard was an alley 16 feet in width and immediately north of the alley were 14 lots, 40 feet in width, upon which were located residences. Immediately west of the west line of University Avenue, and north of the right of way, was a one and one-half story house in which the plaintiff and his father and mother together with some of his grandparents lived. South of the right of way and parallel thereto was the right of way of the Illinois Terminal Railroad Company upon which interurban cars were operated. Just south of the latter right of way was an east and west street known as Cerro Gordo. There was a park in Decatur, known as the "Fairview Park" located south of the tracks, together with the Garfield and Roosevelt Schools. At the corner of Cerro Gordo and Oakland south of the tracks was a grocery store. There was also a plant known as the H. Mueller Manufacturing Company south of the tracks and about five blocks east of Oakland Avenue. There was a beaten path across the tracks of the railroad between Oakland and University Avenue and over the Illinois Terminal Railroad Company's track leading to Cerro Gordo Street, which was used by numerous adults and children going to the grocery store, the H. Mueller Manufacturing Company, the schools, the park and other areas in Decatur located south of the tracks. There is some evidence that along the north line of the right of way there was a plank

529

over a ditch, and at the south edge of the Illinois Terminal Railroad Company there were some steps that led down to Cerro Gordo Street.

On June 3, 1932 sometime prior to 8:30 in the morning an extra freight was made up consisting of an engine, tender, three boxcars and caboose, and at about 8:30 that morning it was travelling west on the rails of the Wabash track. The train crew consisted of six members, the engineer, fireman, front brakeman in the engine, the conductor and two other men in the caboose. The engineer, A. E. Watson, the front brakeman, John B. Kuecher, and the list man, G. A. Fowkes, were the only members of the crew surviving at the time of the trial. There is no evidence in the record that vision on that morning was in any way obscured. The train was travelling at a rate estimated by the witnesses from 15 to 25 miles an hour. As the train approached Oakland Avenue, an object was seen to come onto the track. The engineer, Watson, the front brakeman, Kuecher, and apparently the fireman, all thought it was a dog. The engineer, Watson, testified at the trial that when he got "I suppose two blocks, I looked down the track, and I saw something that looked like a dog on the track. When I got close enough, I thought it was a child, a boy. I tried to stop, set the brakes in emergency, and the engine and tender ran over the boy. Before I got to it, I saw it moving, and that's when I set the brakes. That was when I was less than one block, about forty feet, from the object when it moved. . . . It might have been a little farther or a little closer." Further he said: "There was nothing about the traffic on Oakland Avenue to divert my attention. There was nothing to keep me from watching the child." And he said further: "I tooted, set the brakes, emergency first, and opened the sand lever and began tooting the whistle at the child." Again he said: "I applied the air and sand together when I was the dis-

tance described." Again he testified: "I didn't see the child come up through the weeds onto the track. I saw it when it was already on the track. At that time the train was about two blocks east of Oakland. I assumed it was a dog. I continued to assume it was a dog until I realized it was a child." He also testified: "I had a front window and a side window. You can get your head clear out in the summer. Then when it is cold you keep your head in and look through the glass. I was sitting in the seat box and watching the engine."

John B. Kuecher testified that he was riding on the left side of the engine in front travelling west. The fireman was on the seat box. "It looked like something moved out of the weeds on the south side just like a dog and crawled out of the ditch. I judge maybe we were two or three hundred feet east of the street. I didn't say anything. I thought it was a dog that crawled out. It looked like it was on its hands and knees crawling up to the embankment to the track-rail. As we approached the street, the engineer was sounding his crossing signal with the bell." Again he said: "As near as I can figure out he shut the engine off more or less as he was sounding the crossing signal, and when the fireman, Jimmy Layton said, 'My God, a baby!', I thought it was a dog. Then the engineer just started trying to stop the engine every way possible and also sounding like a stock signal to frighten it off the track. The caboose when it stopped was either on Oakland or a little west of Oakland, it could have been further." Again he said: "I first saw the child when it came out of the weeds. I didn't know what it was." Again he said: "After this object came out of the weeds it just sort of crawled up and never did straighten up but turned around." Again he said: "It was my intention to go through the window and reach that running board and go forward on the en-

gine. I didn't get started before we stopped." Again he said: "When I first saw this object the engineer was whistling for Oakland." Fowkes, the list man, was riding in the caboose, and testified that: "When the train stopped the child was close to the rear trucks of the first car on the north side right inside the tracks." The record shows that the engineer at the time of applying the emergency brake at the same time applied the sanding mechanism, by virtue of which sand is spread upon the rail so as to assist in more rapidly stopping the train. The first sand on the rail was found just a few feet south of the point where blood appeared upon the rail.

There is some evidence in the record that the child was run over 180 feet west of the west edge of the Oakland Street crossing, although there was also some evidence that it was at a place even farther west thereof.

■ In the case of Joy, Adm'r v. Chicago, B. & Q. R. Co., 263 Ill. 465, the railroad engineer saw an object across the rail ahead of him in time to have stopped his train. He believed it to be a bundle of papers. Too late to avoid hitting him the engineer realized the object was a man and thereupon made all reasonable effort to stop the train. The accident happened two miles beyond the city limits far away from any crossing. There was no evidence in the case that the place where the accident happened had ever been used as a pathway. The court held that the railroad owed no duty to the plaintiff to maintain a lookout where they had no reason to anticipate his presence and further stated at page 468: "It has been held by this court, and almost universally, that the law casts no duty upon a railroad company to keep a lookout for trespassers on its track in the open country, remote from public crossings, cities and towns. This is conceded and requires no citation of authority. Exceptions

to this general rule are (1) places where the railroad company has permitted the public to travel along or over its track for a considerable period of time and a considerable number of people have availed themselves of such use, and (2) where the railroad runs through populous portions of a city, where people frequently go upon or pass over the track with knowledge of the company or for such a length of time that the company is chargeable with knowledge. Neither of the exceptions is involved in this case." While the above in our opinion clearly states the applicable law, the exceptions defined therein were not necessary to the opinion.

In Bernier, Adm'r v. Illinois Cent. R. Co., 296 Ill. 464, it is said at page 471: "Where a railroad company has permitted the public to travel over its track for a considerable period of time and a considerable number .of people have availed themselves of such use, the railroad company must keep a lookout for persons on its track."

In McDaniels v. Terminal R. Ass'n of St. Louis, 302 Ill. App. 332, the plaintiff was injured when struck by a timber thrown from defendant's viaduct or bridge. At the time of his injury plaintiff was upon a well-worn pathway upon the right of way of the Wabash Railroad Company at best as a permissible user. In examining the verdict for the plaintiff the court states at page 344: "It has been clearly indicated by the Supreme Court of this State that, even as relates to a track of a railroad company (where some courts have emphasized that public interest in cheap, safe, and rapid transit should be weighed in considering the rights of trespassers or licensees on the tracks), where the railroad company has permitted the public to travel over its track for a considerable period of time and a considerable number of people have availed themselves of such use, the railroad company must keep a lookout for persons on its track."

It would be extending this opinion to lengths not warranted by quoting additional authorities upon this subject.

██ One of the charges of negligence that went to the jury and upon which it returned its verdict was that the company carelessly and negligently failed to maintain a proper lookout. It was a question for the jury to determine whether the employees of the defendant, knowing that an object had come onto the track at least two blocks ahead of them at a place where adults and children were accustomed to be and walk upon the right of way and across the tracks, maintained a proper lookout. They had a right to determine what credence should be given to the testimony of the engineer and of the other witnesses in the case. They had a right to determine whether or not the engineer in the exercise of reasonable care should have recognized the object to be a child before he was forty feet more or less from it. Should we attempt to say that the engineer or other employees of the defendant did or did not maintain a proper lookout would be usurping the function of the jury.

We cannot say on this record that the jury was not justified in arriving at the conclusion it made in this case. In this block from Oakland Avenue to University Avenue, the latter street not crossing the tracks, the evidence shows that people and children were accustomed to use the tracks as a pathway, and the duty of the train crew and particularly the engineer was to be governed accordingly. The latter's obligation to maintain an adequate and sufficient lookout ahead under the circumstances is not to be measured by what he himself said as to recognizing the object to be a child until he was forty feet more or less from it. We cannot say from this record that the court erred in overruling the motion for judgment notwithstanding the verdict nor in holding the verdict was not contrary to the manifest weight of the evidence.

534

■ It is asserted in the brief for the appellant that the verdict is excessive and the result of sympathy for the plaintiff or prejudice against the railroad. While the verdict in this case is large, the injuries suffered were very severe. On the oral argument counsel for the defendant stated that it might well be that the plaintiff would have been better off had one foot been amputated at the time. The evidence shows on the right foot only the large toe and second toe are present. The third, fourth and fifth toes are completely missing and part of the middle of the foot is missing. Technically the doctor testified the metatarsal arch was missing, that there was considerable scarring, and the bottom part of the foot had more moisture than probably would appear in the normal foot. On the left foot the toes are all present but the heel is partly missing and there is a great deal of scar formation. One leg is one and one-half inches shorter than the other. There is no question but what these injuries were all due to this accident. The circumference of the calf of the right leg is approximately one inch less than on the left. The left foot is crooked. The plaintiff was wearing appliances on his feet at the time of the trial that were helpful for his locomotion. The one on the right had been built up considerably due to the fact that there was a shortening of the right lower extremity. The appliances were standard, approved medical appliances and the standard treatment for that type of injury. The doctor who examined the plaintiff further testified, "The left foot, I believe, will serve him pretty well the rest of his life. An amputation is a probability of the right foot in years to come."

Under these circumstances, which are not disputed, we do not believe the verdict is excessive.

The appellant also urges that the court improperly refused its instruction marked No. 1. It will suffice to say that this instruction was based solely upon the theory that the plaintiff was a trespasser and the de-

fendant owed no duty to him except to exercise ordinary care to prevent his injury after the engineer became aware of the danger to which the plaintiff was exposed. It entirely ignores the duty which the defendant owed to persons using the railroad track as a passageway for such a length of time that the company knew or should have known of such use, and it ignores the duty of the railroad under such circumstances. Moreover the instruction directed a verdict and should not have been given.

We find no error in this record and the judgment of the trial court below is hereby affirmed.

Judgment affirmed.